# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. JEFFERY GRAY,<br><br>    *Plaintiff*,<br><br>        v.<br><br>MONOFRAX LLC, MONFRAX HOLDING GmbH, CALLISTA PRIVATE EQUITY GmbH, COMPAGNIE de SAINT-GOBAIN, and WILLIAM ANDREWS,<br><br>    Defendants. | Civil Action No _____<br>Hon.<br>Magistrate<br><br>FALSE CLAIMS ACT COMPLAINT<br><br>**[FILED UNDER SEAL]** |

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**
**DO NOT POST ON ECF**
**DO NOT PUT IN PRESS BOX**

Patricia Stamler (P35905)
Hertz Schram PC
1760 S. telegraph Rd
STE 300
Bloomfield, Hills, PA 48302
(248) 335-5000

Darth M. Newman
Law Offices of Darth M. Newman LLC
1140 Thorn Run Rd, #601
Coraopolis, PA 15108
(412) 436-3443

*Local Counsel for Plaintiff Relator*

*Lead Counsel for Plaintiff Relator*

i

## <u>SEALED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

*Qui tam* plaintiff and Relator Jeffery Gray, by and through his undersigned attorneys, hereby brings this action on behalf of himself and on behalf of the United States of America, against:

- Monofrax LLC;

- Monfrax Holding GmbH;

- Callista Private Equity GmbH;

- Compagnie de Saint-Gobain; and

- William Andrews.

## <u>INTRODUCTION</u>

The claims asserted in this Complaint are based on Defendants submitting, or causing to be submitted, materially false applications for Paycheck Protection Program ("PPP") loans and related forgiveness applications. Defendants, acting through their control and/or ownership of Monofrax LLC, submitted two applications for PPP loans. The first loan application occurred on May 5, 2020, and the second loan application occurred on January 26, 2021. On both applications, Defendants made materially false statements or material omissions about the employee size of Monofrax LLC.

Defendants mischaracterized Monofrax LLC, the nominal applicant, as a "small business" with less than 200 employees. But, under the applicable statutes

ii

and regulations, Monofrax was not a small business at all and did not qualify for any PPP loan funds or forgiveness of these loans.

Defendants compounded their initial false claims by obtaining complete forgiveness of both PPP loans with forgiveness payments being made on or about September 16, 2021, and June 15, 2022. Altogether, Defendants caused the government to pay $4,407,959.80 that would not otherwise have been paid but for the false claims described herein.

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................II

TABLE OF CONTENTS .....................................................................................1

NATURE OF THE CLAIM ................................................................................3

PARTIES.............................................................................................................3

    A. Relator – Jeffery Gray.............................................................................3

    B. Defendant Monofrax LLC .......................................................................4

    C. Defendant Monofrax Holding GmbH......................................................5

    D. Defendant Callista Private Equity GmbH................................................6

    E. Defendant Compagnie de Saint-Gobain.................................................7

    F. Defendant William Andrews....................................................................8

    G. Non-Party Crestmark Bank .....................................................................8

JURISDICTION AND VENUE..........................................................................9

GENERAL ALLEGATIONS ............................................................................10

    I. Governing Law ......................................................................................10

    A. The Federal False Claims Act................................................................10

    B. The Paycheck Protection Program.........................................................11

        i. Affiliation Rules.............................................................................14

    II. Violations of the False Claims Act........................................................18

    A. PPP Loan Applications..........................................................................18

        i. First PPP Loan Application ............................................................19

        ii. Second PPP Loan Application........................................................22

    B. Impermissible Affiliations ....................................................................25

        i. Callista's Affiliations......................................................................26

        ii. Saint-Gobain's Affiliations ............................................................28

    C. Lack of Need for Funds..........................................................................28

i. Payments "Up" to Callista ............................................................... 29

D. Forgiveness Applications .................................................................. 30

ii.First Forgiveness Application .......................................................... 30

iii.     Second Forgiveness Application ................................................ 31

III.Defendants' Role(s) in the False Claims ............................................... 31

A. Monofrax LLC .................................................................................. 32

B. Monofrax Holding GmbH ................................................................. 32

C. Callista Private Equity GmbH ......................................................... 32

D. Saint-Gobain .................................................................................... 33

E. William Andrews .............................................................................. 34

**CAUSES OF ACTION ........................................................................35**

## NATURE OF THE CLAIM

1.      Relator sues Defendants to recover treble damages and civil penalties on behalf of the United States of America for Defendants' false applications for PPP loans and forgiveness which were submitted to the Small Business Administration ("SBA") through Defendants' bank, Crestmark.

2.      Defendants knew they did not meet the established criteria set by the SBA to obtain the PPP loans or forgiveness funds.

3.      Defendants engaged in the submission of false claims to the United States in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA").

4.      As an employee of Defendant Monofrax LLC, Relator personally observed Defendants' financial and management practices and the preparation and submission of the PPP loan and forgiveness applications.

## PARTIES

### A.      Relator – Jeffery Gray

5.      Jeffery Gray is an individual resident and domiciliary of the Commonwealth of Pennsylvania.

6.      In October 1989, Relator Gray commenced his employment with Monofrax's predecessor company.

7.      At all relevant times herein, he was the Director of Information Technology and Special Projects for Defendant Monofrax LLC.

8.      In April 2022, Relator was  promoted to Business Systems Manager.

3

9. Relator's title belies his role in the company and its operations.

10. As a long-serving high-level management employee, Relator was given broad access to the inner financial workings of the company and the relationship between Monofrax and its various Private Equity and other corporate overlords.

11. Relator was present for C-Suite conversations and calculations about the purchase by Callista and later Saint-Gobain, the payments "up" to Callista, and the applications for the PPP loans and forgiveness.

**B.     Defendant Monofrax LLC**

12. Defendant Monofrax LLC ("Monofrax") is a Delaware registered limited liability company with a principal place of business at 1870 New York Ave, Falconer, NY 14733.

13. Its primary business is the manufacture of refractory materials used in the glass manufacturing industry.

14. Monofrax LLC is the nominal applicant and recipient for both of the PPP loans, and both sets of forgiveness paperwork and monies at issue here.

15. Defendant Callista Private Equity purchased 100% of Monofrax on or about June 6, 2016.

16.     As a technical matter, it seems Callista purchased all the entity that came to be known as Defendant Monofrax Holding GmbH which in turns owns all of Monofrax LLC.

17.     Callista Private Equity sold Monofrax Holding GmbH to Saint-Gobain in April 2022.

### C.     Defendant Monofrax Holding GmbH

18.     Defendant Monofrax Holding GmbH is a German registered business entity and the 100% owner of Monofrax LLC.

19.     Until June 20, 2016, Monofrax Holding GmbH was known as Callista Turnaround 3 GmbH.

20.     On or about June 6, 2016, Callista Private Equity purchased Monofrax.

21.     As a technical matter, it appears Callista used a wholly owned acquisition vehicle named Callista Turnaround 3 GmbH to purchase  the entirety of Monofrax LLC from the prior owner, RHI AG, an Austrian registered business.

22.     Callista then changed the name of its acquisition vehicle from Callista Turnaround 3 GmbH to Monofrax Holding GmbH on or about June 20, 2016.

23.     The Third Amended and Restated Limited Liability Company Agreement for Monofrax Holding GmbH is signed by only one person, Olaf Meier, the founding partner, and CEO of Callista Private Equity GmbH.

5

24.     Defendant Monofrax Holding GmbH appears to be the company that Callista later sold to Saint-Gobain.

25.     At all relevant times, Monofrax Holding GmbH owned and controlled Defendant Monofrax LLC and is thereby liable for the violations of the FCA complained of herein.

**D.      Defendant Callista Private Equity GmbH**

26.     Defendant Callista Private Equity GmbH ("Callista") is a German registered business entity and, from at least June 2016 through April 2022, the 100% owner of Monofrax.

27.     Callista may have interposed additional paper entities between itself and Monofrax Holding GmbH, but Callista was the final or ultimate beneficial owner and entity with the power to control Monofrax between June 2016 and April 2022.

28.     During its term of ownership, Callista controlled the management and closely monitored the performance of Monofrax.

29.     Also, Callista caused Monofrax to pay to it substantial sums of money on a more or less monthly basis.

30.     The payments Monofrax made to Callista during Callista's ownership of it totaled more than $1.9 million.

**E.**     **Defendant Compagnie de Saint-Gobain**

31.     Defendant Compagnie de Saint-Gobain is a global conglomerate with a global headquarters in Courbevoie, France and a North American headquarters in Malvern, Pennsylvania.

32.     Compagnie de Saint-Gobain ("Saint-Gobain") is organized under the laws of France with a business address of Les Miroirs 18 Ave D'Alsace Courbevoie, Courbevoie I0 92400.

33.     Saint-Gobain is a global company which brands itself as a "worldwide leader in light and sustainable construction, Saint-Gobain designs, manufactures and distributes materials and services for the construction and industrial markets." *See gen.,* https://www.saint-gobain.com/en/group/who-are-we last visited August 25, 2022

34.     Saint-Gobain purchased Monofrax from Callista on or about April 20, 2022.

35.     As with Callista's earlier purchase from RHI AG, Saint-Gobain purchased the Monofrax Holding GmbH entity which continues to own 100% of Monofrax LLC.

36.     Saint-Gobain may have interposed additional paper entities between itself and Monofrax Holding GmbH, but Saint-Gobain has been the final or

7

ultimate beneficial owner and entity with the power to control Monofrax since April 20, 2022.

37.     Saint-Gobain previously owned Monofrax in 1996..

**F.     Defendant William Andrews**

38.     Defendant William Andrews is an individual resident and domiciliary of New York with an address of 12118 Anne Drive, Alden, NY 14004.

39.     Mr. Andrews was the President and Managing Director of Monofrax at all relevant times and the signatory on each of the PPP loan and forgiveness applications at issue here.

40.     Mr. Andrews voluntarily left Monofrax on or about July 8, 2022.

41.     He received a sizeable "commission" on the sale of Monofrax to Saint-Gobain.

42.     The purchase price which formed the basis of that commission was itself inflated by the value of the PPP loans and forgiveness Monofrax should never have received.

**G.     Non-Party Crestmark Bank**

43.     Non-Party Crestmark Bancorp, Inc. is a corporation organized under the laws of the state of Michigan with a principal place of business located at 5480 Corporate Drive, Suite 350 Troy, Michigan 48098.

44.     Crestmark Bank is a division of MetaBank.

45. Crestmark Bank processed the Monofrax PPP loan applications and made both loans.

46. Crestmark's relationship with Monofrax predates the pandemic and the PPP loan applications.

47. It provided Monofrax a $3 million revolving credit line secured by Monofrax's assets and accounts receivable.

## JURISDICTION AND VENUE

48. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question, and the United Sates is plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

49. The Court may exercise personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a) because at least one Defendant transacted business in this district and the acts complained of occurred within this district.

50. Venue is proper in this District under 31 U.S.C. § 3732(a) because at least one Defendant transacted business in this district and a substantial part of the events establishing the alleged claims arose in this District.

51. No allegation in this Complaint is based on a public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, administrative, or General Accountability Office, or other Government report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source.

9

52.     Under 31 U.S.C. § 3730(b)(2), this Complaint is filed in camera and under seal and shall not be served on Defendants until the Court so orders.

53.     Under 31 U.S.C. § 3730(b)(2), Relator  voluntarily provided the Government with Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in his possession referenced in and/or related to the Complaint.

## GENERAL ALLEGATIONS

### I.     Governing Law

#### A.     The Federal False Claims Act

54.     The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or conspires to do so.  31 U.S.C. § 3729(a)(1).

55.     As of the date of filing, any person found to have violated these provisions is liable for a civil penalty of not less than $12,537 and not more than $25,076 for each such violation, plus three times the damage sustained by the Government.

56.     The FCA imposes liability where conduct is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

10

57. The FCA also broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has tittle to the money or property, that - … is made to a contractor, grantee, or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest ... " 31 U.S.C. § 3729(b)(2)(A).

58. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the Government conducts an investigation of the allegations and determines whether to intervene. 31 U.S.C. §3730(b).

**B.** **The Paycheck Protection Program**

59. The Paycheck Protection Program ("PPP") is the United States Government business loan program established in 2020 through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to help certain businesses, self-employed workers, sole proprietors, certain nonprofit organizations, veterans' organizations, and tribal businesses to continue paying their workers. The program is implemented by the U.S. Small Business Administration ("SBA").

11

60.     The PPP allowed qualified entities to apply for low-interest private loans to pay for their payroll and certain other operating costs. Under the PPP, the allowable amount of a PPP loan was calculated based on the borrowing entity's average monthly payroll costs multiplied by 2.5.[1]

61.     In some situations, an applicant might receive a second loan typically equal to the first.[2]

62.     The PPP loan had to be used to cover payroll costs, rent, interest, and utilities.

63.     The loan may be partially or fully forgiven if the business keeps its employee counts and employee wages stable.

64.     The deadline for entities to apply for a PPP loan was initially June 30, 2020, which was later extended to August 8, 2020.

---

[1] *See* How to Calculate Maximum Loan Amounts – by Business Type, U.S. Small Business Administration, (Jun. 26, 2020) https://www.sba.gov/sites/default/files/2020-06/How-to-Calculate-Loan-Amounts-508_1.pdf (last visited September 7, 2022).

[2] *See* Second Draw PPP Loan, U.S. Small Business Administration, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan (last visited Dec. 13, 2021).

65.     The PPP was reopened on January 11, 2021. The Program ended on May 31, 2021.[3]

66.     The PPP was added under Section 1102 of the CARES Act by amending Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a) *et seq.*, which temporarily permitted the SBA to guarantee 100 percent of the PPP loans.

67.     Section 1106 of the CARES Act, which also amended Section 7(a), further provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

68.     Section 1102 of the CARES Act defines an eligible recipient of a PPP loan as follows:

> (D) INCREASED ELIGIBILITY FOR CERTAIN SMALL BUSINESSES AND ORGANIZATIONS.— (i) IN GENERAL.— During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of — (I) 500 employees; or (II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

15 U.S.C. § 636(a)(36) (D).

---

[3] *See* Paycheck Protection Program, U.S. SMALL BUSINESS ADMINISTRATION, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last visited Dec. 9, 2021).

### i.        *Affiliation Rules*

69.    The PPP loan program was designed and intended to benefit small businesses.

70.    For the purposes of first round PPP loans, the relevant statutes and regulations defined small businesses as those entities with 500 or fewer employees.

71.    For second round loans, the employee limit was lowered to 300.

72.    SBA's existing affiliation rules apply to the PPP loan program's definition of small businesses. In other words, all employees of the entities under the same ownership or control "count" towards the 500 or 300-employee limit.

73.    13 C.F.R. 121.106 (a) sets out how the SBA calculates the number of employees, in pertinent part, as follows:

> (a) In determining a concern's number of employees, SBA counts all individuals employed on a full-time, parttime, or other basis. This includes employees obtained from a temporary employee agency, professional employer organization or leasing concern. SBA will consider the totality of the circumstances, including criteria used by the IRS for Federal income tax purposes, in determining whether individuals are employees of a concern.

74.    The SBA repeatedly clarified that the affiliation rules at 13 C.F.R. § 121.301(f) applied to PPP loans and that for the purposes of counting employees, all foreign and domestic affiliated employees **must** be counted. For example, the SBA's March 12, 2021, FAQs included question 44 on this topic:

> 44. **Question:** How do SBA's affiliation rules at 13 C.F.R. 121.301(f) apply with regard to counting the employees of foreign and U.S. affiliates?

14

> **Answer:** For purposes of the PPP's 500 or fewer employee size standard (or 300 employee size standard for Second Draw PPP Loans and certain entities for First Draw PPP Loans), an applicant **must count all of its employees and the employees of its U.S and foreign affiliates**, absent a waiver of or an exception to the affiliation rules. 13 C.F.R. 121.301(f)(6). Business concerns seeking to qualify for a First Draw PPP Loan as a "small business concern" under section 3 of the Small Business Act (15 U.S.C. 632) on the basis of the employee-based size standard must do the same.

Exhibit 1, March 12, 2021 SBA FAQs (emphasis added).

75.     The applicable affiliation rules appear at 13 C.F.R. § 121.301.

> Concerns and entities are affiliates of each other when one controls or has the power to control the other, **or a third party or parties controls or has the power to control both**. It does not matter whether control is exercised, so long as the power to control exists.

13 C.F.R. § 121.301(f) (emphasis added).

> For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity.

13 C.F.R. § 121.301(f)(1).

76.     The affiliation rules presented a special problem for certain industries which typically organize themselves as several nominally individual businesses owned or controlled by a single entity.

77.     To address this reality, Congress provided statutory carveouts for certain parts of the hospitality industry and some franchise businesses. *See* 15 U.S.C. § 636(A)(36)(D)(iv).

78.      Importantly, Congress and the SBA took the exact opposite approach with the private equity industry and global conglomerates generally.

15

79.     Indeed, private equity companies themselves were explicitly excluded from the PPP program. *See* Exhibit 2, 85 Fed. Reg. 23450 at 23451(2.)(a.) (April 28, 2020).

2. Clarification Regarding Eligible Businesses

*a. Is a hedge fund or private equity firm eligible for a PPP loan?*

No. Hedge funds and private equity firms are primarily engaged in investment or speculation, and such businesses are therefore ineligible to receive a PPP loan. The Administrator, in consultation with the Secretary, does not believe that Congress intended for these types of businesses, which are generally ineligible for section 7(a) loans under existing SBA regulations, to obtain PPP financing.

Exhibit 2, 85 Fed. Reg. 23450 at 23451(2.)(a.) (April 28, 2020).

80.     Private equity owned operating companies were permitted to access PPP funds only if they could meet **both** the employee limits under the affiliation rule and specifically certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Exhibit 1, March 12, 2021, SBA PPP FAQs at #31.

81.     As the SBA repeatedly explained, companies owned by larger entities, including private equity companies, had to take special care to ensure that no other sources of liquidity were available before they consumed scarce PPP funds.

*b. Do the SBA affiliation rules prohibit a portfolio company of a private equity fund from being eligible for a PPP loan?*

Borrowers must apply the affiliation rules that appear in 13 CFR 121.301(f), as set forth in the Second PPP Interim Final Rule (85 FR 20817). **The affiliation rules apply to private equity-owned businesses in the same manner as any other business subject to**

16

**outside ownership or control.** However, in addition to applying any applicable affiliation rules, all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that **''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''**

Exhibit 2, 85 Fed. Reg. 23450 at 23451(2.)(a.) (April 28, 2020) (emphasis added).

82.    The SBA specifically clarified that employees associated with foreign affiliates **must be included** when calculating total number of employees.

*1. Treatment of Foreign Affiliates*

Are employees of foreign affiliates included for purposes of determining whether a PPP borrower has more than 500 employees?

Yes. The CARES Act specifies that an entity is eligible for a PPP loan only if it is (1) a small business concern, or (2) a business concern, nonprofit organization described in section 501(c)(3) of the Internal Revenue Code, veterans organization described in section 501(c)(19) of the Internal Revenue Code, or Tribal business concern described in section 31(b)(2)(C) of the Small Business Act that employs not more than the greater of 500 employees, or, if applicable, SBA's employee-based size standard for the industry in which the entity operates. SBA's affiliation regulations provide that to determine a concern's size, employees of the concern **''and all of its domestic and foreign affiliates'' are included.** 13 CFR 121.301(f). Therefore, to calculate the number of employees of an entity for purposes of determining eligibility for the PPP**, an entity must include all employees of its domestic and foreign affiliates**, except in those limited circumstances where the affiliation rules expressly do not apply to the entity. **Any entity that, together with its domestic and foreign affiliates, does not meet the 500-employee or other applicable PPP size standard is therefore ineligible for a PPP loan.**

Exhibit 3, 85 Fed. Reg. 30835 at 30837 (May 21, 2020) (emphasis added).

17

83.     Defendants applied for their first round of PPP funds on or after May 5, 2020.

84.     The Defendants did not get the benefit of the government's enforcement discretion applicable to borrowers who applied for a PPP loan prior to May 5, 2020.

85.     The SBA often specifically warned potential borrowers that civil and criminal liability could attach. *See e.g.,* 85 Fed. Reg. 20811 at 20814 (April 15, 2020).

86.     As described below, Monofrax fails both the affiliation and financial need tests as the *sine qua non* for eligibility for a PPP loan.[4]

## II.     Violations of the False Claims Act

87.     Defendants violated the False Claims Act by submitting materially false applications and supporting materials in connection with their two applications for PPP loans and their two applications for PPP loan forgiveness.

### A.     PPP Loan Applications

88.     Monofrax made successful applications for First and Second Round PPP loans.

---

[4] The exceptions referenced at 13 C.F.R. § 121.301(f)(7) and 13 C.F.R. § 121.103(b) do not apply. For example, neither Callista nor Saint-Gobain appear on the list of Small Business Investment Companies, and neither is owned or controlled by an Indian Tribe.

89.    Both loans were submitted to and processed by Crestmark Bank.

### i.    *First PPP Loan Application*

90.    Defendants' first loan application was signed on May 5, 2020, and submitted thereafter. Exhibit 4, First Round Application.

91.    It was signed by Defendant Andrews on behalf of Monofrax LLC. *Id.*

92.    PPP loan applications solicit various bits of information from the applicant including the number of employees and the identity of any owners.

93.    Defendants listed Monofrax Holding GmbH as the 100% owner of Monofrax and listed 158 employees. *Id.*

94.    The applications also include 8 questions that require "yes" or "no" checkbox answers. Question 3 reads:

> Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A.

95.    Defendants marked "yes" in response to this question but did not submit any explanation or any Exhibit A. *Id.*

96.    Defendants failed to disclose that Callista owned Monofrax and failed to disclose that Monofrax was affiliated with entities employing well over 1,000 employees.

97.    These omissions alone make the certifications in the application false.

19

98.     Monofrax made each of the below additional certifications and each was false when made.

- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).

- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.

- Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

- I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects.

*Id.* at 2.

99.     Defendants' Borrower Certificate included as part of the loan application packet included the below additional express certifications which were also false when made.

- Borrower is not obtaining this account on behalf of a non-United States citizen or legal permanent resident.

- All information and certifications in Borrower's application for the Loan, including, without limitation, all information set forth in Borrower's Paycheck Protection Program

20

Borrower Application Form (SBA Form 2483) completed and executed by Borrower in connection with the Loan, remain true and correct in all respects, and the **Borrower has not withheld any material information**.

- The Borrower is eligible for the Loan under all applicable laws, regulations and rules, **including without limitation applicable size, affiliation** and other eligibility requirements under 15 U.S.C. § 636(a), 13 C.F.R. § 120.100 *et seq*., 13 C.F.R. § 121.101 *et seq*., SBA SOP 50 10 5(K), the Coronavirus Aid, Relief, and Economic Security Act of 2020 ("CARES Act"), and rules or other guidance issued by the SBA.

*Id.* at 17 (emphasis added).

100.   As part of the Disbursement Direction, Request and Authorization form which formed a part of the application packet, Defendants again affirmed that the above certifications were true by making the below affirmation.

Borrower affirms that the representations and warranties contained in the Loan Documents are true, accurate and complete as of the date hereof.

*Id.* at 28.

101.   Nowhere did Defendants indicate to Crestmark or the government that Monofrax was actually owned by Callista and that through Callista and the applicable affiliation rules, Monofrax did not have 158 employees but had well over 1,000 employees.

102.   For its part, after Saint-Gobain acquired Monofrax, it did not correct any of the above false claims or otherwise take any steps to remedy the false claims or return any of the unlawfully obtained government funds.

21

103. These affirmative and by omission false statements make the First Round PPP loan application false under the FCA.

104. Defendants obtained a First Round PPP loan in the amount of $2,509,290.00.

### ii.        *Second PPP Loan Application*

105. Defendants' second loan application dated January 26, 2021 was also signed by Mr. Andrews, listed only Monofrax Holding GmbH as an owner, and did not include any Exhibit A or other explanation or disclosure of Monfrax's many affiliated employees. Exhibit 5, Second PPP Loan Application.

106. The phrasing for Question 3 of the SBA's FAQs was changed slightly to read:

> Is the Applicant or any owner of the Applicant an owner of any other business, or have common management *(including a management agreement)* with any other business? If yes, list all such businesses *(including their TINs if available)* and describe the relationship on a separate sheet identified as addendum A.

*Id.* (changes in italics).

107. Despite the expansion of the inquiry,  Defendants checked "no" in response to Question 3 on the second application. *Id.*

108. Defendants falsely reported that Monofrax had only 130 employees when, according to the applicable laws, rules, and regulations then in force, should have reported  it had well over 1,000 employees.

22

109. On the face of the application, Defendants made several false certifications including by certifying each of the below statements were true when they were not:

- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) and the Department of the Treasury (Treasury) implementing Second Draw Paycheck Protection Program Loans under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) and the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the Paycheck Protection Program Rules).

- The Applicant, **together with its affiliates** (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; or (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, employs no more than 300 employees per location.

- Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

*Id.* at 2 (emphasis added).

110. For its part, Crestmark reported under Part E General Eligibility, Defendants had made the below certification to the bank.

The Applicant has certified to the Lender that the Applicant, **together with its affiliates** (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; (3) if NAICS 72, employs no

23

more than 300 employees per physical location; or (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, employs no more than 300 employees per location.

*Id.* at 8 (emphasis added).

111. Defendants' certification to the bank was false.

112. Crestmark made a similar report of apparent compliance at Part F Applicant Certification of Eligibility, that "[t]he Applicant has certified to the Lender that the Applicant is eligible under the Paycheck Protection Program Rules." *Id.*

113. As above, Defendants' underlying certification to Crestmark was false.

114. As part of the "Loan Agreement" Defendants represented and certified to Crestmark:

> Each of the answers provided and certifications made by Borrower in the application submitted under the Act to the SBA in connection with the Loan ("Application") is **true, accurate and complete**, and Borrower will comply with all such certifications.

> and

> Borrower is eligible to receive the Loan under the rules and regulations that have been issued by the SBA relating to the PPP. Borrower shall comply with all rules, regulations and requirements of the PPP and the SBA in existence at the time of the Loan and as are thereafter promulgated, including, but not limited to, those **relating to affiliates**.

*Id.* at 18-19 (emphasis added).

115.   As with the first application, Defendants' affirmative and by omission false statements about its ownership structure and affiliations with over 1,000 employees makes the Second Round PPP loan application false under the FCA.

116.   Also as above, after Saint-Gobain acquired Monofrax, it did not correct any of the above false claims or otherwise take any steps to remedy the false claims or return any of the unlawfully obtained funds

117.   Defendants obtained a Second Round PPP loan in the amount of $1,838,971.78.

### B.      Impermissible Affiliations

118.   Through application of the affiliation rules, and at all relevant times, Monofrax did not qualify for any PPP Loans or forgiveness.

119.   The PPP was intended to benefit small American businesses, not permit foreign private equity companies and conglomerates to siphon taxpayer funded emergency relief funds out of the country.

120.   At the time the First and Second PPP loan applications were submitted, approved, and funded, and when the first loan was forgiven, Monofrax was owned by Callista.

121.   As detailed below, Callista owns or controls numerous businesses including some truly large businesses.

122. In total, through Callista, Monofrax was affiliated with entities employing well over 1,000 employees.

123. This information was omitted from its application materials and false and inaccurate information was submitted instead.

124. At the time the Second PPP loan was forgiven, Monofrax was owned by Saint-Gobain, a gigantic international conglomerate.

125. Had the government been aware of the true facts, that Monforax was affiliated with so many employees, it would not have awarded any PPP loan guarantees or forgiveness monies to Defendants.

### i. *Callista's Affiliations*

126. Callista publishes press releases announcing the purchase and sale of businesses.

127. Tracking these self-reported transactions reveals the size and scope of the web of affiliated companies under the Callista umbrella at the time Monofrax submitted false PPP loan and forgiveness applications.

128. Monofrax falsely reported 158 employees on its Round One application and 130 on its Round Two application.

129. In addition, and at the same time, Callista owned at least 6 other companies with over 1,500 employees.[5]

130. Each of Callista's portfolio companies are affiliated with each other through Callista as the common owner.

131. Callista itself boasts that "[w]e are actively involved in our portfolio companies and support them with our many years of expertise in optimizing corporate processes and structures." *See* https://www.callista-pe.de/en/about-us last visited August 26, 2022.

132. This boasting rang true for Monofrax, Callista was actively involved in the management and direction of Monofrax.

---

[5] Employees counts taken from Callista press releases announcing company purchases:

- 740 employees – ETM Engineering
- 235 employees – Globus Gummiwerke
- 200 employees – Mainsite Technologies
- 190 employees – MWK Renningen
- 90 employees – MelchersRaffel
- 100 employees – PCH Metals

*See* Exhibit 6, Collection of Callista Press Releases.

### ii.    *Saint-Gobain's Affiliations*

133.   Saint-Gobain asserts it has over 166,000 employees across 76 countries – well beyond the number of employees permitted by the PPP. *See* https://www.saint-gobain.com/en/group/who-are-we last visited August 23, 2022.

134.   In addition, for only the first half of 2022, Saint-Gobain claims to have operating income of over €2.7 billion, recuring net income of over €1.8 billion, free cash flow of over €1.6 billion, and to have spent €431 million in share buybacks. Exhibit 7, Saint-Gobain Half-Year Financial Report 2022 at 1.

135.   In fact, the very press release Saint-Gobain issued announcing the purchase of Monofrax boasted similar figures including 166,000 employees across 75 countries and €44.2 billion in sales in 2021. *See* Exhibit 8, May 12, 2022, Saint-Gobain Press Release at 2.

136.   Despite its great economic success and immense size, Saint-Gobain obtained the benefit of $1,864,363.71 in government funds through the Second PPP loan forgiveness to which it was not entitled.

137.   Additionally, Saint-Gobain is the final beneficiary of the First PPP loan and forgiveness obtained by Monofrax – an additional $2,543,595.09.

### C.    **Lack of Need for Funds**

138.   Callista acquired 8 additional companies between January 2020 and November 2021.

139.   Callista's own press releases reported sales or revenue figures for five of these companies which total to nearly €150 million. *See* Exhibit 9, Collection of Pandemic Acquisition Press Releases.

140.   Any company completing this many acquisitions during the pandemic could not have truthfully certified that "[c]urrent economic uncertainty makes [a PPP] loan request necessary to support the ongoing operations of the Applicant".

141.   During the period of time when PPP funds were sought and obtained, Callista was continuing to suck cash out of Monofrax for its own benefit. *See* Exhibit 10, List of Payments to Callista.

142.   Ultimately, Callista used its illegally obtained government monies to bolster the Monofrax balance sheet in advance of selling the business.

143.   There was no fire sale of Monofrax.

144.   While Saint-Gobain ultimately purchased Monofrax in April 2022, another corporation had been actively negotiating to purchase Monofrax at the same time.

### i.   *Payments "Up" to Callista*

145.   During Callista's term of ownership, it required Monofrax to pay to it roughly $50,000 per month as a "management fee".

146.   In some months this payment by Monofrax to Callista was as large as $100,000 and in some months Monofrax also had to spend thousands of dollars to

fund the travel and housing for various visiting Callista staff. *See* Exhibit 10, List of Payments to Callista.[6]

147.   Starting in July 2019, Crestmark, then the bank providing Monofrax a revolving line of credit, imposed a Free Cash Flow Covenant which prohibited the payment of management fees to Callista if the trailing 12-month financial records showed less than $10,000 in free cash flow.

148.   During the pandemic, Monofrax failed the free cash flow covenant test more often than it passed but still made 6 payments to Callista in 2020 and 2021 totaling $259,191.72.

### D.    <u>Forgiveness Applications</u>

149.   Defendants sought and obtained forgiveness for both PPP loans thereby costing the government at least $4,407,959.80.

### ii.    <u>*First Forgiveness Application*</u>

150.   On September 9, 2021, Defendant Andrews signed a First Round PPP Loan Forgiveness Application. *See* Exhibit 11, First Loan Forgiveness Application.

151.   That application was granted, and the loan was paid off seven days later. *See* Exhibit 12, Notice of Paycheck Protection Program Forgiveness Payment (indicating First PPP Loan Forgiveness Payment Date of September 16, 2021).

---

[6] Callista also caused Monofrax to pay for various IT conversion and supervision services to Premium IT Services a company wholly owned by Callista. Some or all of these services were either unnecessary or above fair market value.

152.   Through the forgiveness process, Defendants extracted from the government a total of $2,509,290.00 in principal and $34,305.09 in interest.

### iii.        *Second Forgiveness Application*

153.   Defendant Andrews signed a Second Round PPP Loan Forgiveness Application which was submitted by Defendants in or around May 2022.

154.   This application was also granted, and the loan was paid off. *See* Exhibit 13, Notice of Paycheck Protection Program Forgiveness Payment (indicating Second PPP Loan Forgiveness Payment Date of June 15, 2022).

155.   In connection with their Second PPP loan and forgiveness application, Defendants were able to extract from the government a total of $1,838,971.78 in principal and $25,392.93 in interest.

156.   As between the two loans, the government paid a total of $4,407,959.80 because of Defendants' violations of the FCA.

## III.   Defendants' Role(s) in the False Claims

157.   Each of Defendants is liable for the false claims at issue here as each took steps to facilitate them and/or refused to take necessary action to ameliorate them.

158.   In addition, each benefitted from the submission of false claims.

31

A.     **Monofrax LLC**

159.   Monofrax LLC is the nominal applicant and signatory on each piece of paper submitted to the government and/or Crestmark in support of both loan applications and both forgiveness applications.

160.   Monofrax LLC received the loan disbursements, and the forgiveness payments were made on its behalf.

161.   Monofrax continued paying monies to Callista after receiving PPP loan funds.

B.     **Monofrax Holding GmbH**

162.   Monofrax Holding GmbH is the German paper entity that owns 100% of the units or equity of Monofrax LLC.

163.   As the 100% equity owner, Monofrax Holding controls and directs the activities of Monofrax LLC, and benefits from the financial performance of Monofrax LLC and the ill-gotten PPP monies at issue here.

C.     **Callista Private Equity GmbH**

164.   Callista Private Equity owned and/or controlled Monofrax Holding GmbH and through that paper entity owned and/or controlled Monofrax LLC at the time both PPP loan applications were submitted, when the loans were disbursed, at the time the first forgiveness application was submitted, and when the first forgiveness funds were disbursed.

32

165. In addition, Callista caused Monofrax to pay to Callista substantial sums of money both before and after the PPP loan and forgiveness applications were made and granted.

166. Through regular meetings, including in-person meetings, and performance monitoring, Callista directed and controlled the management and performance of Monofrax LLC.

167. Callista could have directed a portion of its capital reserves or other access to liquidity to reduce or eliminate Monofrax's need for PPP loan funds but chose not to.

168. Callista reaped the benefit of the false PPP applications and disbursements at issue here through direct savings, payments from Monofrax to Callista, and by increasing the sale price paid by Saint-Gobain.

**D.    Saint-Gobain**

169. Saint-Gobain obtained Monofrax LLC and Monofrax Holding GmbH from Callista after the balance sheet had been improved by the disbursement of two rounds of PPP loans, the forgiveness of the first round, and submission of the second forgiveness application.

170. Saint-Gobain owned Monofrax when the second forgiveness payments were made on behalf of Monofrax.

33

171. At no time did Saint-Gobain seek to return any PPP monies, or the monies paid by the government in connection with either forgiveness application.

172. Instead, through its purchase, Saint-Gobain facilitated Callista's final conversion of PPP monies.

### E.   William Andrews

173. Defendant Andrews personally signed each PPP loan and forgiveness application at issue here.

174. In addition to presiding over the balance sheet improvements occasioned by fraudulent access to the PPP program, Defendant Andrews directed continued payments "up" to Callista despite violations of the Free Cash Flow Covenant imposed by Crestmark.

175. Defendant Andrews also personally benefited as his commission increased commensurate with the increased sale price paid by Saint-Gobain which priced in the PPP loan funds.

## CAUSES OF ACTION

### COUNT I
### Violations of the False Claims Act: Presenting or Causing a False Claim
### (31 U.S.C. § 3729(a)(1)(A))
### (All Defendants)

176.   The foregoing allegations are repeated and realleged as if fully set forth herein.

177.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

178.   Defendants knowingly and willfully violated the False Claims Act by presenting, or causing to be presented, false claims for payment or approval.

179.   Specifically, and as alleged in more detail above, Defendants presented, or caused to be presented, materially false applications for PPP loan funds and then for forgiveness of those loans.

180.   Defendants repeatedly certified compliance with applicable PPP laws, rules, and regulations despite not being compliant.

181.   Defendants similarly repeatedly certified the existence of facts which were not true.

182.   All Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that the facts and certifications to which they attested were not true and

35

that they made, presented, or submitted, or caused to be made, false or fraudulent claims for payment to the government.

183.   Each of the applications submitted or caused to be submitted by the Defendants is a separate false and fraudulent claim.

184.   The Defendants presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

185.   The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made to or on behalf of the Defendants, made such payments, and has been damaged.

186.   Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States has been damaged in an amount to be determined at trial.

## COUNT II
### Violations of the False Claims Act: Making, Using, or Causing to be Used a False Record or Statement
### (31 U.S.C. § 3729(a)(1)(B))
### (All Defendants)

187.   The foregoing allegations are repeated and realleged as if fully set forth herein.

188.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.

189.   Defendants knowingly and willfully violated the False Claims Act by making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

190.   Specifically, for purposes of obtaining or aiding to obtain PPP loans and then forgiveness of those loans, Defendants made or presented, or caused to be made or presented, to the United States false or fraudulent applications and/or records, knowing these materials to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

191.   Each application submitted to the Government in support of Defendants' above-described false claims is a separate false record or statement and separate violation of 31 U.S.C. § 3729(a)(1)(B).

192.   The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent applications

37

and/or records, authorized payments to be made to or on behalf of the Defendants, made such payments, and has been damaged.

193. Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT III
**Violations of the False Claims Act: Conspiring to Violate the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(C))**
**(All Defendants)**

194. The foregoing allegations are repeated and realleged as if fully set forth herein.

195. The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the False Claims Act.

196. Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the False Claims Act.

197. Defendants conspired to submit false and fraudulent claims related to their applications for PPP loans and then forgiveness of those loans.

198. Defendants did in fact submit false and fraudulent claims.

199. As a consequence of their conspiracies, the United States paid these claims when it would not have but for Defendants' unlawful conduct.

38

200.   As a result of this conspiracy, and the resulting false or fraudulent claims submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

**COUNT IV**
**Violations of the False Claims Act: Conspiring to Violate the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(G))**
**(All Defendants)**

201.   The foregoing allegations are repeated and realleged as if fully set forth herein.

202.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or  conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

203.   Upon receipt of improperly obtained PPP loan and forgiveness funds, Defendants had an obligation to repay and refund to the Government the amounts paid by the government.

204.   Defendants knowingly and willfully violated the False Claims Act by failing to so repay or refund the monies it received.

205.   Each improperly obtained set of loan or forgiveness funds received by or on behalf of Defendants generates a separate obligation to repay or refund those

39

ill-gotten monies and Defendants' failure to do so is a separate violation of 31

U.S.C. § 3729(a)(1)(G).

206.   The United States was unaware of the foregoing circumstances and

conduct of Defendants.

207.   Had the government been aware of Defendants' knowing false

certifications and knowing failure to return overpayments it would have taken steps

to recover them.

208.   The United States has been damaged as a result in an amount to be

determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE, Relator, on behalf of himself as well as the United**

**States requests the following relief:**

a. A judgment against Defendants, jointly and severally, in an amount equal to all damages due to the Government, including treble damages, under the FCA;

b. A judgment against Defendants, jointly and severally, for all civil penalties due to the Government for each of Defendants' violations of the FCA;

c. That Relator recover from Defendants, jointly and severally, all costs of this action, with interest, including the cost to the Government for its expenses related to this action;

d. That Relator be awarded all reasonable attorneys' fees in bringing this action;

40

e. That Relator be awarded the maximum amount of the proceeds of this action as allowed under 31 U.S.C. § 3730, and/or any other applicable provision of law;

f. An award of pre- and post-judgment interest; and

g. Such other and further relief to Relator and/or the United States of America as this Court may deem just and proper.

## REQUEST FOR TRIAL BY JURY

Under Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

BY:        */s/Patricia Stamler*
Patricia Stamler
Hertz Schram PC
1760 S. telegraph Rd
STE 300
Bloomfield, Hills, PA 48302
Telephone:  (248) 335-5000
Email:        pstamler@hertzschram.com

*Local Counsel for Plaintiff Relator*

*/s/ Darth M. Newman*
Darth M. Newman
Law Offices of Darth M. Newman LLC
1140 Thorn Run Rd, # 601
Coraopolis, PA 15108
Telephone:  412-436-3443
Email:        darth@dnewmanlaw.com

*Lead Counsel for Plaintiff Relator*

41